

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEF:RAB/LB
F. #2019R01370

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 2, 2025

By ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re: United States v. Christopher Terranova
       Criminal Docket No. 23-516 (KAM)

Dear Judge Matsumoto:

   The government respectfully submits this letter in anticipation of the defendant's sentencing, scheduled for July 17, 2025, at 11:00 a.m.[1] On November 22, 2024, the defendant was found guilty following a jury trial before Your Honor on Counts 1 through 6 of a six-count Superseding Indictment. The testimony at trial included testimony from four victim witnesses, who were all minors, ranging from ages 12 to 15, at the time the charged conduct began. For the reasons set forth below, the government respectfully requests that the Court impose on the defendant a sentence of 40 years' incarceration.

   I.  Facts of the Offense

   The charged conduct was the result of an investigation that began in 2023 conducted by special agents of the Federal Bureau of Investigation (FBI) in conjunction with the New York City Police Department (NYPD). (PSR ¶10). The investigation uncovered that the defendant, who was employed as a police officer with the NYPD at the time, engaged in sexually explicit conversations with several minor males, from whom he solicited sexually explicit images and videos, and to whom he sent explicit images. (Id.). The investigation also revealed that the defendant engaged in sexual acts with at least two minor males and repeatedly traveled between New York and Texas to meet with one minor male for the purposes of sexual contact. (Id.). The defendant's conduct is summarized herein.

---

[1] The government has received one victim impact statement from John Doe 4. Currently, the government does not anticipate any victims making statements at sentencing. The government will promptly advise defense counsel and the Court if this changes.

John Doe 1

In late 2019, the defendant met John Doe 1, a 15-year-old boy who lived in Texas, online through Instagram. (Id. ¶¶ 11,12). They subsequently began communicating regularly, using Instagram, Snapchat, and Facetime. (Id. ¶ 11). These conversations included the exchange of sexually explicit photographs at the request of the defendant as well as the defendant requesting that John Doe 1 perform live sex acts over Facetime for the defendant, which John Doe 1 did. (Id. ¶ 16).

John Doe 1 was also sexually abused by the defendant in-person. (Id. ¶ 11). This conduct began in August 2020, when John Doe 1 was still only 15 years old. (Id.). The defendant traveled to Texas from Staten Island to meet with John Doe 1 at least sixteen times during the charged time period and purchased a house just down the street from John Doe 1's family home. (Id. ¶¶ 11,13). John Doe 1 testified that he engaged in oral sex with the defendant between five and ten times during their in-person encounters. (Id. ¶ 16).

During their interactions, the defendant also sent John Doe 1 hundreds of messages, many of which were sexually explicit, including:

- On August 12, 2020, the defendant stated to John Doe 1, after a sexual encounter: "It was the best day I ever had. I never wanted it to end." (Id. ¶ 12).

- On September 13, 2020, the defendant wrote to John Doe 1, "I love everything that you do you get me so turned on in every single way like no one has ever done for me #True love." (Id. ¶ 13).

- On September 26, 2020, while discussing sexual activity, the defendant stated, "Then me flipping you over and one day putting my cock in your ass, lubing you up before I do and hearing you moan, MORE babe more," "Kissing your neck and lips and giving you the best head and taking your cock deep in my mouth." (Id.).

- On October 21, 2020, the defendant stated, "I am so in love with you, please never change, grow with me, listen to me, be positive and continue to be loyal and we will have some amazing times together and would love more and more memories with you as you get older… I love you Prince, my one and only, my forever babe, love you much." (Id.).

In the defendant's residence, law enforcement found a safe on the floor of the defendant's bedroom closet which included an envelope with memorabilia related to John Doe 1, including a letter providing descriptions of John Doe 1's likes and dislikes, family members, and ethnicity, as well as photographs of John Doe 1. (Id. ¶ 61). There was also a note dated November 20, 2022, written by the defendant to John Doe 1 that appeared to be questions for John Doe 1, with some having answers written next to them. (Id. ¶ 62). For example, the defendant wrote "Please tell what I did to scare you?" In the next line, as a response " – I'm very aggressive" is written. (Id.). On the next page, "How is it you fell out of love w/me after I just had sex w/you earlier this month – What is going through your mind/head? Anything?" (Id.). Toward the end of

the second page, there were several lines with arrows pointing to questions, one of which stated, "relationship boyfriend No – bc [because] im controlling + aggressive." (Id.).

There was also a second letter dated August 9, 2020, which discussed the progression of the defendant and John Doe 1's relationship from interacting via Instagram and text messages to meeting in person. (Id. ¶ 63). The letter also reflected that John Doe 1 "fulfilled something in [the defendant] and [the defendant] certainly did for [John Doe 1] on 8/9/2020," when John Doe 1 was just 15 years old. (Id.).

John Doe 2

In or about early 2022, when John Doe 2 was approximately 15 years old, the defendant began messaging John Doe 2 on social media and asking John Doe 2 about his sexual experiences and about masturbating. (Id. ¶ 34). John Doe 2 also testified that during their interactions the defendant "kept begging," for John Doe 2 to send an image of his penis as he wanted "to see [him]," and the defendant "need[ed] something." (Id. ¶ 35). During their interactions, the defendant sent John Doe 2 images of his penis and persuaded John Doe 2 to send the defendant images of John Doe 2's penis. (Id. ¶ 34). The defendant messaged John Doe 2 that he had a "little cute cock." (Id.).

When John Doe 2 was still just 15 years old, the defendant offered to give John Doe 2 a ride home from John Doe 2's friend's 16th birthday party. (Id.). Instead of taking John Doe 2 directly home, the defendant pulled the car over on the side of the road in a partially wooded area. (Id.). The defendant performed oral sex on John Doe 2 in the vehicle and forced John Doe 2 to perform oral sex on the defendant. (Id.).

John Doe 3

In or around September 2021, when John Doe 3 was just 11 years old, he met the defendant. (Id. ¶ 40). Subsequently, in approximately September 2022, when John Doe 3 was 12 years old, the defendant started to engage with John Doe 3 on social media. (Id.). In those conversations, the defendant solicited pictures from John Doe 3, including pictures of John Doe 3's "pubes" and genitalia. (Id. ¶ 41). He also asked John Doe 3 about his "schmeat," referring to John Doe 3's penis, and suggested that John Doe 3 should measure his penis. (Id.). The defendant, a grown man, also sent John Doe 3, who was 12 years old, a picture of the defendant in his underwear. (Id.).

John Doe 4

In or around March 2023, when John Doe 4 was just 15 years old, he met the defendant. (Id. ¶ 42). At the time, the defendant was a Police Officer at the 121st precinct and held the role of Youth Coordinator Officer. (Id. ¶ 42). John Doe 4 was a victim of a robbery and went with his mother to make a complaint at the 121st Precinct. (Id.). The defendant subsequently used NYPD systems to look up the details of the robbery and later contacted John Doe 4 from the defendant's personal phone. (Id. ¶¶ 43, 44). In doing so, the defendant used his position of power as a police officer to put the victim at ease. On March 30, 2023, the defendant sent John Doe 4 a text message that stated "Hey, [John Doe 4]. It's Chris Terranova. The cop you met at the 121 that day with mom. I just wanted to reach out to see if you were doing ok after the incident. I hate

3

seeing these things happen to good guys like yourself." (Id. ¶ 44). The conversation later turned sexual in nature on social media. Between May 19, 2023, and May 20, 2023, the defendant engaged in a direct message conversation on Snapchat with John Doe 4. (Id. ¶ 47). In those communications, the defendant asked if John Doe 4 had any sexual interest in boys, to which John Doe 4 replied that he did not. (Id. ¶¶ 47,48). The defendant also asked Doe 4 about what he watches during masturbation and asked John Doe 4 to "send [him] something to see" and asked John Doe 4 about his pubes, referring to his pubic area. (Id. ¶ 48). The defendant also sent John Doe 4 an image of the defendant's pubic area and back of his penis. (Id. ¶ 49). After this message, the defendant then texted John Doe 4, "See. It's nothing. Your turn," in an attempt to have John Doe 4 send him an explicit picture in return. (Id.). At that point, John Doe 4 told his mother what the defendant was doing and law enforcement got involved. (Id. ¶¶ 51-52).

John Doe 5

The investigation also revealed that, in or around June 2018, the defendant was in contact with a minor male, who was 13 years old ("John Doe 5").[2] (Id. ¶ 54). The defendant met John Doe 5 in the course of his professional duties. On June 17, 2018, John Doe 5's mother contacted the 121st precinct to report that John Doe 5 was missing. (Id.). John Doe 5 had a history of bipolar disorder and had run away from home while emotionally distraught. Officers of the NYPD, including the defendant, canvassed for and located John Doe 5 in Staten Island. (Id.). One day later, on June 18, 2018, the defendant began having contact with John Doe 5 via Snapchat. (Id. ¶ 56). The messages continued through April 2019. From the messages, it is apparent that the defendant attempted to instill a sense of brotherhood with John Doe 5, as well as build trust with him. (Id.). In their messages, the defendant also talked about his sexuality, for example, telling John Doe 5 that "btw what you said before you could love someone like a brotha it's not gay at all, just wanted you to know that," and "when you have trust and a bond with someone, NO ONE can take that away." (Id. ¶ 57). He also attempted to engage John Doe 5 in sexually explicit conversations as he did with his other victims. (See id. ¶¶ 58-60).

  II. Guidelines Calculation

The government agrees with the United States Probation Department ("Probation") that the defendant's United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") are life. The government's calculation is reflected below, and to the extent it differs from Probation's calculation, it is noted:

Group 1 (Count 1 & 5: John Doe 1):

| | |
|---|---|
| Base Offense Level (§ 2G2.1(a)) | 32 |
| Plus: victim less than 16 (§ 2G2.1(b)(1)(B))) | +2 |
| Plus: engaged in sexual contact (§ 2G2.1(b)(2)(A)) | +2 |

---

[2] John Doe 5 is not the victim of any of the charged offenses, but the information contained herein is relevant pursuant to Title 18, United States Code, Section 3553(a)(1).

4

| | |
|---|---:|
| Plus: use of a computer (§ 2G2.1(b)(6)(B)(ii))) | +2 |
| Plus: abuse of position of trust (§ 3B1.3) | +2[3] |
| Total: | 40 |

Group 2 (Count 2 & 6: John Doe 2):

| | |
|---|---:|
| Base Offense Level (§ 2G2.1(a)) | 32 |
| Plus: victim less than 16 (§ 2G2.1(b)(1)(B))) | +2 |
| Plus: engaged in sexual contact (§ 2G2.1(b)(2)(A))) | +2 |
| Plus: use of a computer (§ 2G2.1(b)(6)(B)(ii))) | +2 |
| Total: | 38 |

Count 3: John Doe 3:

| | |
|---|---:|
| Base Offense Level (§ 2G2.1(a)) | 32 |
| Plus: victim less than 16 (§ 2G2.1(b)(1)(B))) | +2 |
| Plus: use of a computer (§ 2G2.1(b)(6)(B)(ii))) | +2 |
| Total: | 36 |

Count 4: John Doe 4:

| | |
|---|---:|
| Base Offense Level (§ 2G2.1(a)) | 32 |
| Plus: victim less than 16 (§ 2G2.1(b)(1)(B))) | +2 |
| Plus: use of a computer (§ 2G2.1(b)(6)(B)(ii))) | +2 |

---

[3]   Probation did not include an enhancement for abuse of a position of trust with respect to John Doe 1.  The government takes the position that the abuse of a position of public trust enhancement pursuant to Guidelines section 3B1.3 applies to John Doe 1, as well as John Doe 4 (for whom it was applied by Probation).  The testimony at trial showed that the defendant told John Doe 1 that he was a police officer and John Doe 1 testified that the fact that the defendant was a police officer made him feel like he could trust the defendant.  (Tr. at 680).  As to Probation's Guideline calculation, this enhancement would increase the adjusted offense level for Count Group 1 from 38 to 40.  The government also applies a two-point enhancement for use of a computer to the calculations relating to John Does 3 and 4.  However, these enhancements do not change the total estimate under the Guidelines, which is life.

|  | |
|---|---:|
| Plus: abuse of position of trust (§ 3B1.3) | +2 |
| Total: | 38 |

Multiple Count Adjustment:

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 40 | +1 |
| Group 2 | 38 | +1 |
| Count 3 | 36 | +1 |
| Count 4 | 38 | +1 |

| | |
|---|---:|
| Total Units | +4 |
| Greater Adjusted Offense Level | 40 |
| Combined Adjusted Offense Level | +4 |
| Plus: repeat and dangerous offender (§ 4B1.1) | +5 |
| Total Offense Level: | 49 |

(PSR ¶¶ 97-131).

The defendant's Criminal History Category is I,[4] and the applicable Guidelines range is life imprisonment. (PSR ¶ 185).

### III. Appropriate Sentence

In determining the sentence to be imposed, the Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to promote both specific and general deterrence.

---

[4] The defendant's lack of criminal history does not set him apart from other similar offenders. Indeed, the vast majority of federal sexual abuse and child pornography offenders have no prior records at the time that they are sentenced. U.S. Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System 320, Ch. 10 at 303 (2011) available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Mandatory_Minimum_Penalties/20111031_RtC_Mandatory_Minimum.cfm.

See 18 U.S.C. § 3553(a). For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 40 years' incarceration.

### A. The Nature and Circumstances of the Offense

There is no doubt that the nature and circumstances of the offenses in this case are serious. Sexually exploiting and abusing children is among the most serious of crimes. The immediate and long-term damage caused to victims of such conduct is hard to comprehend, and the trial testimony, including the testimony of four of the defendant's young, minor victims, was devastating. It exposed the defendant's pattern of grooming and manipulation of numerous young boys, his extensive hands-on and online abuse, and the lengths the defendant was willing to go to in order to gain access to children, including exploiting his position as a law enforcement officer.

The defendant's pattern of grooming is laid out in black and white in the text and Snapchat communications between the defendant and John Doe 4. (GXs 603S, 604S). The defendant emphasized trust, loyalty, and brotherhood throughout his messages to John Doe 4. (See, e.g., GX 603S at 2-3, 10, 14, 18-22). After initially reaching out by text, the defendant moved John Doe 4 to Snapchat, where their messages would disappear, ostensibly in an effort to destroy any evidence of his crimes. (See, e.g., GX 603S at 24; see also Tr. 303 (John Doe 4's mother testifying that the photograph the defendant sent to John Doe 4 of the defendant's penis "delete[d] because that's how Snapchat works"); PSR ¶ 12 (noting that numerous image and video files were exchanged between the defendant and John Doe 1, but, "due to the nature of Snapchat, were not recovered")). Once the defendant had John Doe 4 on a more secure platform, he began engaging John Doe 4 in sexual chats—discussing pornography, masturbation, pubic hair, penis size, and erections—and attempting to get John Doe 4 to engage in and create images of sexual acts. (See generally GX 604S). The defendant was persistent, despite John Doe 4's efforts to politely disengage from the defendant's sexual chats. John Doe 4 described being "distraught" and "very scared" by what the defendant did to him, and described the experience as "traumatic." (See JD 4 Impact Statement; see also Tr. 287).

The testimony of the defendant's other victims shows that the defendant engaged in a similar pattern with each of his victims—emphasizing brotherhood and loyalty, relying on his role as a police officer to instill trust, and persistently seeking sexually explicit images. (PSR ¶ 65). The defendant's youngest victim was just 11 years old when he met the defendant, and 12 years old at the time of the defendant's attempted abuse. (Id. ¶¶ 40-41; see also id. ¶ 41 (John Doe 3 sent the defendant a photograph of himself holding a teddy bear)).

The defendant's conduct extended beyond online abuse into the hands-on sexual abuse of both John Doe 1 and John Doe 2. This hands-on conduct included driving John Doe 2 to a wooded area after picking John Doe 2 up from a birthday party and forcing John Doe 2 to engage in oral sex with the defendant. (Id. ¶ 36-37; Tr. 578). John Doe 2 described being in "shock" during the encounter. (Tr. 578). When John Doe 2 later reported the defendant's conduct to his guidance counselor, his counselor recalled that John Doe 2 was "visibly upset and shaking." (Tr. 701).

John Doe 1 was also abused by the defendant both online and in person, and that abuse spanned years. The defendant's behavior as it relates to John Doe 1 appeared obsessive, and the defendant went to great lengths to gain access to John Doe 1. He traveled to Texas at least 16 times and purchased a home in Texas just down the street from John Doe 1 in order to be close to his victim. (PSR ¶¶ 11, 13, 18-33). The defendant kept a safe in his bedroom full of grooming notes, love letters, and photographs of John Doe 1. (Id. ¶¶ 61-63; GXs 502S, 503S, 504S, 506S, 509S). The defendant also had more than 80 images and videos of John Doe 1 on his phone. (PSR ¶ 64). The only sexual conduct to which the defendant admits is engaging in sex with John Doe 1, "but only after he turned 17." (ECF No. 117-1, Dr. Krueger Report at 4). Despite the defendant's continued denial, however, the jury verdict and the evidence prove the defendant's crimes against all four victims and that the defendant engaged in sex with John Doe 1 starting when John Doe 1 was just 15 years old. (See, e.g., PSR ¶ 12 n.5 ("On August 13, 2020, [when John Doe 1 was 15], the defendant sent the message 'What's hot was us making love to each other'"); see also id. ¶ 13 (on September 21, 2020, when John Doe 1 was 16, the defendant wrote to him, "you being with me in my own house . . . and making love to me and the fact that I was able to pull this off with getting a house to be so close to you.")).

To this day, the defendant continues to express his sexual interest in his victim, John Doe 1, demonstrating a total lack of remorse and understanding of the seriousness of his conduct. The defendant reported to Dr. Richard Krueger, who was hired by the defense in connection with sentencing, that the "past 10 times he has masturbated, the most recent being in March of 2025, he said that his sexual fantasy had involved John Doe 1." (ECF No. 117-1, Dr. Krueger Report at 6). The government was also advised that the defendant's counsel contacted John Doe 1 to ask him to help the defendant at sentencing before this Court, again demonstrating the defendant's fundamental failure to appreciate the severity of his conduct and the damage he caused his victims.

B. The Defendant's History and Characteristics

The defendant's history and characteristics are evident in his repeated criminal conduct. This was not a short-term or one-time offense. Rather the defendant was convicted of conduct spanning years, including the repeated abuse of John Doe 1 from the time John Doe 1 was just 15 years old until he reached the age of consent. His protracted behavior was the product of considerable planning and repeated conscious decisions to manipulate and victimize children. This included the planning and execution of at least sixteen trips to Texas to gain access to John Doe 1, and the purchase of a home for the purpose of being close to and having better access to his victim.[5] (PSR ¶ 11, GX 100AS-3224 ("You being with me in my own house . . . and making love to me and the fact that I was able to pull this off with getting a house to be so close to you is more than a sign of everything happens for a reason."); see also PSR ¶¶ 18-33).

Moreover, the defendant's role as a police officer (and a mandatory reporter of child abuse) is a significantly aggravating factor. The defendant was a police and youth officer,

---

[5] To the extent the defendant insinuates that his conduct was a result of decision making while under the influence of alcohol, (see, e.g. ECF No. 117-1, Dr. Krueger Report at 5, 10), the calculated nature of planning and booking interstate travel and the purchase of a home soundly rebuts that suggestion.

8

sworn to uphold the law and protect the citizens of New York. Instead, he engaged in a pattern of abuse spanning years that involved preying on and sexually abusing and exploiting young boys. The defendant used his position as a police officer to gain access to victims and to gain their trust and the trust of their families. (See, e.g., Tr. 554-55, 564 (the defendant met John Doe 3 when the defendant was acting in his capacity as a uniformed police officer); PSR ¶¶ 42-43 (the defendant met John Doe 4 when John Doe 4 came into the police precinct as a robbery victim and the defendant obtained John Doe 4's phone number through NYPD systems); 55-60 (the defendant met John Doe 5 when the defendant and other officers were canvassing for John Doe 5, whose mother reported him to the police as a runaway child experiencing a mental health crisis); Tr. 680 (John Doe 1 testifying that the fact that the defendant was a police officer made him feel he could trust the defendant)).

One of the most notable instances of the defendant's use of his position as a police officer involves John Doe 4. When John Doe 4 was 15 years old, his mother brought John Doe 4 to the defendant as an already traumatized victim of a robbery. (PSR ¶ 42; Tr. 299 (John Doe 4's mother describing John Doe 4 as depressed and withdrawn following the robbery)). Rather than doing his job and helping to protect this young victim, the defendant saw an opportunity to take advantage of that vulnerability to further victimize John Doe 4. The defendant used his access to NYPD databases to obtain John Doe 4's phone number from the robbery complaint, before contacting John Doe 4 by phone and beginning his efforts to sexually exploit John Doe 4. (PSR ¶ 43).

In an equally egregious circumstance, on June 17, 2018, the defendant encountered a 13-year-old child (John Doe 5) who was experiencing a mental health crisis. (Id. ¶ 54). John Doe 5's mother had contacted the 121st precinct, where the defendant worked, to report her child missing, advising that he had run away from home, had a serious history of mental health issues, and was emotionally distraught. (Id. ¶ 55). The defendant and other officers canvassed the area and located John Doe 5, who was acting "irrational and irate." (Id.). John Doe 5 was then transported to a local hospital for psychiatric evaluation. (Id.). One day later, the defendant began communicating with John Doe 5 via Snapchat. The messages continued from June 18, 2018, until April 2019, and followed a similar pattern as the defendant employed with the victims underlying the counts of conviction—attempting to instill a sense of brotherhood and trust in John Doe 5 before engaging the child in sexual conversation. (Id. ¶¶ 56, 59-60). The messages make clear that: (i) the defendant was with John Doe 5 in the hospital when John Doe 5 was hospitalized for psychiatric evaluation, and the defendant gave John Doe 5 money while at the hospital, (id. ¶ 59); (ii) after John Doe 5 was released from the hospital, the defendant met with John Doe 5 in person on multiple occasions, (id. ¶ 56); and, (iii) as with the other victims, the defendant sought to engage John Doe 5 in sexual conversations, including conversations in which the defendant asked John Doe 5 about masturbation, discussed the size of John Doe 5's penis, and stated that he (the defendant) would "eye fuck" John Doe 5, (id. ¶¶ 57-60).[6]

---

[6] The conduct relating to John Doe 5 was not charged. However, the government has provided the defendant with documentary evidence of this conduct that proves this conduct by a preponderance of the evidence and the defendant has not objected to its inclusion in the PSR.

9

The defendant's conduct, and particularly his use of his role as a police officer to access and victimize children, deeply undermines the public's trust in the integrity of its law enforcement officers at a time in which the public's confidence in the police is particularly vulnerable. See Aimee Ortiz, "Confidence in Police Is at Record Low, Gallup Survey Finds," Aug. 12, 2020, N.Y. Times, available at https://www.nytimes.com/2020/08/12/us/gallup-poll-police.html. When law enforcement authorities trusted with enforcing the rules violate those rules and become the abusers, the community they police has no basis to accept the law's fair application, the institutions on which we rely become undermined and unstable, and law enforcement ceases to be a resource for those in danger. (See JD 4 Impact Statement (John Doe 4: "Ever since this happened it has been very hard for me to trust people, especially cops because I don't know what their true intentions are and if they are actually there to protect me.")).

Because this crime was serious and undermines the public's trust in the integrity of the law enforcement community of which the defendant was ostensibly a proud member, a substantial punishment is necessary to restore the public's faith in the evenhanded administration of justice and to demonstrate that nobody is above the law.

### C. Respect for the Law, Just Punishment, and Deterrence

Perhaps one of the most unfathomable aspects of this case is the defendant's complete inability to accept any responsibility for his conduct or even recognize that his actions—even those to which he admits—were criminal or even wrong. This inability to grasp the severity of his crimes requires a significant sentence to meet the sentencing goals of specific deterrence and to protect the public, and specifically children, from future harm by the defendant.

While the defendant argues that he has taken responsibility for his conduct—an assertion in his sentencing submission that is followed immediately by denial and minimization of the conduct of which the jury found him guilty, (Def. Sentencing Submission at 17-18)—in actuality the defendant has refused to accept any responsibility for his crimes.[7] To this day, the defendant maintains that his sexual abuse and exploitation of children was "slightly inappropriate, but not criminal," and chalks it up to the fact that "people make mistakes." (PSR ¶¶ 90, 92; see also id. ¶ 82-87). He asserts that he was trying "to help" his victims and "did not at the time think that it was improper for an adult to engage in such intimate discussions with a minor regarding puberty and sexuality." (ECF No. 117-1, Dr. Krueger Report at 4; see also id. at 10 ("[The defendant] explained his interactions with his four victims as involving entirely an attempt to help them with their sexual identity.")).

Instead of taking any ownership for his conduct, the defendant blames (and denigrates) his victims. On a September 12, 2024 jail call, the defendant referred to John Doe 4

---

[7] The defendant also argues in his sentencing submission that the Court should consider that the age of consent in some states is 16 years old. (Def. Sentencing Submission at 18). Not a single one of the defendant's identified victims had reached the age of 16 when the defendant's abuse began. (See Tr. 55 (John Doe 3 was 12); PSR ¶¶ 11 (John Doe 1 was 15); 34 (John Doe 2 was 15); 42 (John Doe 4 was 15); 54 (John Doe 5 was 13)).

10

as a "little loser" for reporting the defendant's abuse to John Doe 4's mother. (See Ex. A). The defendant's failure to recognize or acknowledge the severity of his conduct is all the more shocking because the defendant was a trained NYPD youth outreach officer who was responsible for providing information to minors about the dangers of online communications. (PSR ¶ 94). Some of the statements the defendant made to Probation during his presentence investigation interview that reflect his utter lack of remorse or accountability include the following:

1. He "did not wake up one day and decide [he] likes children," he is "not a predator." The defendant stated, "were certain things [he] said inappropriate? Absolutely. [He's] not arguing that. [Is] [he] a predator? No." (Id. ¶ 82).

2. The defendant does not "think those inappropriate things [he] said was a crime." Further he "never used [his] position as a police officer to manipulate children or groom children." He cited his five years of experience being "in and out of schools" to "teach kids not to use phones for inappropriate images and texts," his "passion" for teaching that course, and "talking about suicide prevention and depression" with students as reasons why he was not attempting to groom children. (Id. ¶ 83).

3. The defendant reported that when agents contacted John Doe 1, John Doe 1 was "forced to come out of the closet," because of the instant prosecution, all due to "a couple of pictures in [his] safe," one of him horseback riding and another being a "selfie" John Doe 1 took. The defendant stated that if there was "any wrongdoing" with respect to John Doe 1, he wants to "say sorry because it (the instant prosecution) forced him to disclose his [sexuality] before he wanted to." The defendant advised that he was upset that a "person [he] cared for had to be manipulated to change his story [by agents]," making their "normal" conversations predatory. (Id. ¶ 85).

4. The defendant stated that he "reached out to [John Doe 2], asking if he is ok after putting [his sexual preferences] out there." The defendant added that he had conversations with John Doe 2 "for months" advising him that "whatever you're going to do, just don't get hurt." John Doe 2 was "bragging about how many people he was hooking up with," and while a "message or two was inappropriate" the defendant was "not seeking to be a predator." (Id. ¶ 87).

5. The defendant stated that John Doe 2 "waited for the opportunity" to make a "mockery of [the defendant]" who "was there for [John Doe 2]." (Id. ¶ 88).

6. Of text messages with John Doe 4, . . . The defendant said that "a couple of messages were inappropriate, absolutely. Any sexual desire? Absolutely not." (Id. ¶ 90).

7. The defendant made reference to the uncharged victim (John Doe 5) and attributed a message of a lewd nature to him being "mandated to go to the field" and "sometimes has a mouth" with his "OCD and anxiety," causing him to "get hyper." He denied any wrongdoing with respect to the uncharged victim. (Id. ¶ 91).

8. During trial, he "realized some of the messages" were inappropriate, and he "understands that now," but "people make mistakes." (Id. ¶ 92).

11

9. After reiterating his statements that he was not aware when he sent the messages that they were "inappropriate," this officer directly asked the defendant if it is his statement regarding the offense that he – a trained youth outreach officer – who was responsible for providing information to minors about the dangers of online communication – did not know that engaging in sexual conversations with teenage boys was illegal. The defendant responded that he did not know that. (Id. ¶ 94).

Because the defendant has refused to accept responsibility, and even worse, continues to minimize and justify his conduct, he represents an ongoing danger to the community that can only be mitigated by an extensive period of incarceration. Critical to protecting the community is the defendant's recognition that his actions caused harm and cannot be repeated. Such is not the case here, and thus incapacitation through incarceration is warranted.

Moreover, the need for general deterrence in these types of cases—which include not just the in-person abuse of children, but online predation—is significant. Today, there are countless applications that can and are used by sexual predators like the defendant to engage in the very same crimes as those committed by the defendant. The pool of vulnerable minors on these applications grows larger everyday as children increasingly access and use the internet. Indeed, in a report published in 2021, the United States Sentencing Commission observed that "a growing proportion of production offenders exploit victims remotely through the use of the internet and mobile devices."[8] According to the same report, "the expansion of digital and mobile technology has contributed to a 422 percent increase in the number of production offenders sentenced over a 15-year period, from 98 offenders in fiscal year 2005 to 512 offenders in fiscal year 2019." Id. at 3. In light of the increasing frequency at which these crimes are being committed, it is important for the public to be aware that predators like the defendant seek out and exploit victims in this arena, and for people like the defendant to understand that their crimes—which include the use of the internet to exploit and groom children—will be punished commensurate with their seriousness. Thus, a lengthy sentence in this case would send a strong message to those, both domestically and abroad, who seek to sexually exploit children online and to lure children through the use of online applications for in-person abuse, that courts will not tolerate the sexual abuse of children and that the consequences for such criminal conduct will be significant.

### D. The Need to Avoid Unwarranted Sentence Disparities

A sentence should also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). A sentence of 40 years' incarceration would be consistent with sentences imposed in this district and on a national level in comparable cases. Notably, in cases involving online abuse only,

---

[8] United States Sentencing Commission (2021), Federal Sentencing of Child Pornography: Production Offenses, at 1, 35, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2021/20211013_Production-CP.pdf (the "Child Pornography Production Report") ("For example, over one-third (35.4%) of production offenders sentenced in fiscal year 2019 were internet strangers who met their victims through an online platform, more than double the proportion of offenders sentenced in fiscal year 2010 who met their victims online (14.3%)).

defendants frequently receive sentences well above the 15-year mandatory minimum sought by the defendant in this case. See, e.g., United States v. Caroleo, No. 17-CR-177 (S-1) (ENV) (the defendant, who pleaded guilty just prior to trial, was sentenced to 30 years' incarceration in connection with his conviction for the online sexual exploitation of a 14-year-old minor); United States v. Mejia, 18-CR-81 (JMA) (imposing 28 year sentence in case where the defendant used Facebook, posed as a 13-year-old-boy, and manipulated minors to perform sexually explicit acts and photograph their younger relatives nude); United States v. Weiss, No. 21-CR-449 (PMH) (S.D.N.Y. Nov. 15, 2022) (imposing 25-year sentence in case where the defendant engaged in the sexual exploitation of numerous young teens through the use of Snapchat); United Sates v. Simpson, No. 21-CR-97 (GRB) (the defendant, a NYPD police officer, caused multiple minors to create sexually explicit images of themselves, including directing the minors to engage in demeaning acts towards themselves, was sentenced to 23 years); United States v. Deutsch, No. 18-CR-502 (FB) (imposing 20 year sentence in case where defendant was convicted after trial of sexually exploiting four victims, between ages 11 and 16, but none of whom were manipulated to physically abuse themselves); see also United States v. Valerio, 14-CR-94 (JFB) (the defendant was sentenced to 60 years' incarceration for paying a woman in Ukraine to produce custom-made sexually explicit videos of a two-year-old child and himself producing child pornography involving a six-year-old child).

### E. The Consequence of the Defendant's Crimes are Severe

The consequences of the defendant's actions have been severe, and the defendant has shown no remorse for his actions or the harm he caused his victims. The pain he caused his victims is something they will carry with them for the remainder of their lives. John Doe 4 wrote an impact statement in which he described the lasting damage caused by the defendant. He concluded by saying, "I hope that after sentencing I will be able to rest easy and finally get it out of my head for good because I don't want to think about what he did ever again and have it haunt me for the rest of my life." (JD 4 Impact Statement).

The defendant's predatory acts in this case caused irreparable harm to each of his victims, and this dangerous and predatory conduct merits a strong sanction. The defendant left in his wake a trail of traumatized young boys who now must spend their lives processing what he did to them. The defendant's sentence is an opportunity to let the defendant's victims know that their suffering matters and that conduct like the defendant's will not be tolerated. It is an opportunity to help them "rest easy" knowing that coming forward helped hold this predator accountable and ensure that he is never able to hurt another child again.

## IV. Restitution

Pursuant to Title 18, United States Code, Section 3663A and U.S.S.G. § 5E1.1(a)(1), the Court is required to order restitution for the full amount of the victims' compensable losses. John Doe 2 has sought restitution in the amount of $600, which the government understands the defendant does not object to.

V. <u>Conclusion</u>

For the foregoing reasons, the government respectfully submits that a sentence of 40 years' incarceration followed by lifetime supervision is appropriate in this case.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:  /s/_____
Rachel A. Bennek
Lauren Bowman
Assistant U.S. Attorneys
(718) 254-6140 (Bennek)

cc:  Clerk of the Court (KAM) (by ECF)
Vinoo Varghese, Esq. (by ECF)
Lisa Langone, Probation Department (by email)

14